UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| CALLIDUS CAPITAL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 15-365-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| GARY J. SMITH, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Plaintiff Callidus Capital Corporation's ("Callidus") Motion for Summary Judgment. [Record No. 16] This case stems from loans that Callidus made to Fortress Resources, LLC ("Fortress") which are now in default. The loans were guaranteed by Defendant Gary Smith ("Smith"). In its motion, Callidus argues that Smith breached the terms of the Guaranty by failing to honor his obligations under the agreement when they came due after Fortress defaulted. [*Id.*] For the following reasons, Callidus' motion will be granted.

## I.

Defendant Smith was at all times relevant to this case an officer and director of Fortress, a company engaged in coal mining. [Record No. 22, ¶ 2] Fortress was incorporated in April 2014 for the purpose of acquiring the assets of a company that had filed for bankruptcy protection under Chapter 11. [*Id*. at ¶¶ 4, 5] To fund the acquisition, Fortress pursued financing from Callidus. [*Id*. at ¶¶ 10, 11] Callidus ultimately made two multi-million dollar

loans to Fortress. In return, Callidus required security in the form of first-ranking security interests on Fortress' assets and personal guaranties, one of which was from Smith.

### A. The Financing Documents

Prior to executing the notes and loan agreements, on September 3, 2014, Callidus e-mailed a Term Sheet to Smith in his capacity as president of Fortress. [No. 16, Ex. I] The document stated that its purpose was to "provide [Fortress and the Guarantors] with the terms and conditions" of Callidus' proposed Credit Facility offer. [Record No. 16, Ex. I, p. 1] The Term Sheet further provided that Callidus' Credit Facility was "subject to satisfactory completion of [its] due diligence, approval . . . by [its] credit committee and the execution of the appropriate legal documentation," and that it would begin its due diligence review once the parties had signed the documents. [*Id.*] For the Credit Facility, the Term Sheet provides for two loans, the first for "up to" $12,000,000, and the second for "up to" $8,000,000. [*Id.*] It further stated that the offer would expire if not signed by September 3, 2014. Smith's exhibit of the Term Sheet contains his signature as an officer of Fortress and of another company that served as a Corporate Guarantor (dated September 4, 2014) and his signature as Personal Guarantor (dated September 5, 2014). [Record No. 21, Ex. 4, p. 4-5]

On September 5, 2014, Fortress entered into its first Loan Agreement with Callidus and executed a Demand Facility A Note in favor of Callidus for $11,350,000. [Record No. 16, Ex. A, Ex. B] The Loan Agreement provided the amount of Fortress' indebtedness, and the terms of payment and default. [Record No. 16, Ex. A] It also stated that it was secured by personal guaranties and all of Fortress' personal property assets. [*Id.* at 10-11] The Loan Agreement and Note clearly indicate that these documents were the final agreement between the parties, providing:

No representation or warranty or other statement made by the Lender concerning the Loan shall be binding on the Lender unless made by it herein or in writing as a specific amendment to this Agreement.

THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES.

[*Id*. at 32, 33]

Along with the Loan Agreement and Note, on September 5, 2014, Smith signed a Guaranty in which he agreed to be personally liable for Fortress' obligations under the Note and Loan Agreement, along with Callidus' costs in collecting the indebtedness, in the event of Fortress' default. [Record No. 16, Ex. F] The Guaranty provides that each Guarantor's liability "shall be direct and immediate and not contingent upon the pursuit of any remedies against . . . the security or liens available to the Holder for the payment of the Obligations . . . ." [*Id*. at ¶ 3] Smith also agreed to waive "any right to require that resort be had to any security for the Obligations" under the Note. [*Id*. at ¶ 7] Additionally, he agreed that his obligations under the Guaranty would not "be subject to any counterclaim, set off, deduction or defense based upon any claim that any Guarantor may have against Borrower, any other guarantor, or Lender." [*Id*. at ¶ 9] Moreover, Smith's obligations would "remain in full force and effect," regardless of any bankruptcy or any action taken by a court, trustee, or receiver in a bankruptcy proceeding. [*Id*.]

Callidus agreed to extend additional financing to Fortress. On January 9, 2015, Fortress executed a second Demand A Facility note in favor of Callidus in the amount of $5,000,0000. [Record No. 16, Ex. C] The same day, Fortress also executed a second Demand B Facility note for $13,500,000, which reinstated and replaced the original Demand Facility A Note.

[Record No. 16, Ex. D] Along with these notes, the parties executed an Amended and Restated Loan Agreement, which replaced the original Loan Agreement and provided the terms of the Amended Loan and repayment of the Notes. [Record No. 16, Ex. E] Repayment was secured by Fortress' personal property assets and by "[a]n unlimited guaranty of payment of the Loan . . . by each of the Guarantors, jointly and severally . . . ." [*Id.* at 17] And like the original Loan Agreement, the Amended Loan Agreement provided:

> No representation or warranty or other statement made by the Lender concerning the Loan shall be binding on the Lender unless made by it herein or in writing as a specific amendment to this Agreement.
>
> THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

[*Id.* at 39, 40] Also on January 9, 2015, Smith executed a Re-affirmation of Credit Documents in which he affirmed his obligations under the Guaranty and acknowledged that they now extended to the additional financing under the Notes and Amended Loan. [Record No. 1, Ex. D]

## B.      The Personal Guaranty

Smith alleges that, throughout the negotiation and financing process, Callidus made representations to him regarding his personal guaranty of Fortress' indebtedness. In his Affidavit, Smith states that representatives from Callidus continuously indicated that a personal guaranty would not be required or, that if it were required, it would be released upon the occurrence of various conditions. [Record No. 22] He further contends that the documents Callidus presented to him for his signature routinely included terms relating to the personal guaranty that deviated from the oral representations. [*Id.*] For example, Smith asserts that a

representative informed him that the personal guaranty would be released upon appraisal, but that the Term Sheet provided for more stringent conditions of release—that Fortress first obtain $2,000,000 in equity or subordinated debt. [*Id.* at ¶¶ 16, 20] Smith states that he "read the term sheet and noted its deviations from [the Callidus representative's] representations earlier that day, but chose to sign it" nonetheless. [*Id.* at ¶ 21]

Smith asserts that he objected to the initial draft of the Final Amended and Restated Loan Agreement because it did not contain a condition for the guaranty's release. [*Id.* at ¶ 61] He stated that he then wrote directly to Callidus' counsel to ask that she remove the guaranty; however, counsel replied "that she had been told by Callidus that the personal guaranties were to stay in." [*Id.* at 62] Smith then sent multiple e-mails to Callidus' representatives requesting release of the guaranties, but Callidus did not respond to these requests. [*Id.* at ¶¶ 64-66] But according to Smith, a Callidus representative assured him during a telephone conversation that the guaranty would be released upon Fortress' acquisition of $2,000,000. [*Id.* at ¶ 67] Fortress' counsel sent Smith a redline version of the Loan Agreement, providing that the guaranties "shall be released" once Fortress could "provide evidence satisfactory to [Callidus] of its receipt of cash proceeds of an additional equity infusion in the amount of no less than $2 million." [*Id.* at ¶ 68] Callidus' counsel revised this provision, providing that the guaranty "may be released, at the discretion of Callidus," upon satisfaction of the condition. [*Id.* at ¶ 69] Amd although he was aware of this revision, Smith indicates that he nonetheless signed the Loan Agreement and Re-Affirmation of his Guaranty because he felt he "had little choice" due to Fortress' need for cash, and also because he believed he could rely on Callidus' oral representations. [*Id.* at ¶ 70]

Smith ultimately signed the final Amended and Restated Loan Agreement which provides that Smith's personal guaranty "may be released, at the discretion of the Lender, at such time as the Borrower provides evidence satisfactory to Lender of its receipt of cash proceeds of an additional equity infusion in the amount of no less than $2 million." [Record No. 16, Ex. E, p. 19]

## C. Fortress' Bankruptcy

Fortress filed a voluntary bankruptcy petition on November 5, 2015. [Record No. 16, Ex. H] Smith signed the petition as Fortress' President and CEO and was also listed as an unsecured creditor based on his status as a shareholder. [*Id*. at 3, 44] Fortress operated as a debtor in possession, and the court prohibited creditors from taking possession of or otherwise taking legal action with respect to its assets. The automatic stay was to remain in effect until January 30, 2016. [Record No. 21, Ex. 23, ¶ 4] The Court also entered a Cash Collateral Order, permitting the Debtor to continue to use its assets during this period. [*Id*.] Pursuant to this Order, Fortress was required to bring its mining equipment and "all such assets to the surface (and adequately store[] and secure[] on the surface with other surface equipment owned by the debtor) for potential sale." [*Id*. at ¶ 17] Smith alleges that Callidus improperly required Fortress to bring these assets to the surface, and that it is responsible for resulting damage because Callidus was responsible for either storing the equipment or paying Fortress for storage. [Record No. 22, ¶ 77]

On January 15, 2016, Fortress filed a motion to authorize the sale of substantially all of its assets under 11 U.S.C. § 363. [Record No. 21, Ex. 24] Fortress asserted that it had "evaluated its ability to reorganize and determined that the sale of substantially all of its Assets" was in all parties' best interests, and that "in its business judgement . . . an auction

may offer the most advantageous terms and greatest economic benefit . . . ." [*Id*. at ¶ 5]  As authority for the sale, and as Debtor in the proceeding, Fortress asserted that "Section 363(b)(1) of the Bankruptcy Code authorizes the Court to allow a debtor in possession . . . to sell . . . property of the estate." [*Id*. at ¶ 13]  Fortress further asserted that such a sale is appropriate "[w]here a debtor believes[,] in the exercise of its business judgment[,]" that the sale "is in the best interests of the debtor and its estate . . . ."  [*Id*.]

On January 21, 2016, Callidus objected to the proposed sale. [Record No. 21, Ex. 25] Callidus asserted that the sale was inappropriate because Fortress intended to sell its assets free and clear of Callidus' liens in exchange for the buyer's assumption of Fortress' junior debt. [*Id*. at ¶ 3] Callidus further noted that Fortress' only seeming authority to sell the assets under § 363 was its "assumption that Callidus will consent to the proposed sale . . . ." [*Id*. at ¶ 13] Callidus stated however, that it had "no intention of consenting to a sale of any of its Collateral free and clear of its liens" unless it received appropriate proceeds.  [*Id*.]  Callidus concluded by asserting that it would "not consent to any such sale of its Collateral," as the proposed sale amounted to a violation of its rights as a secured creditor.  [*Id*. at ¶ 17]

The Bankruptcy Court ultimately granted Fortress' motion, permitting it to sell substantially all of its assets at an auction.  [Record No. 21, Ex. 31]  Callidus made an offer at the auction that Fortress rejected. [Record No. 21, Ex. 32]  Another potential buyer offered, to assume Fortress' junior debt, which Callidus "refus[ed] to approve . . . ." [*Id*. at 5]  Nonetheless, Fortress accepted the bid, stating that "[b]oth the Committee and the Debtor" believed it to be the best offer.  [*Id*. at 4]  The Bankruptcy Court subsequently approved the sale, concluding that Fortress was permitted to "sell the Purchased Assets free and clear of all Liens and Claims . . . ."  [Record No. 21, Ex. 34]

# II.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The initial burden is on the moving party to inform the court of the basis for its motion and identify those portions of "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any," which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). A party opposing a motion for summary judgment cannot "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Instead, the non-movant must introduce sufficient evidence that a reasonable finder of fact could find in its favor. *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003).

When considering a motion for summary judgment, the court must view the facts contained in the record and draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *see also 60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987). Further, the court may not weigh the evidence or determine the truth of any disputed matter. Instead, the only judicial determination is whether sufficient evidence exists from which a jury could reasonably find for the non-moving party. *Wiley v. United States,* 20 F.3d 222, 226 (6th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). The court must ultimately determine whether there is such a sufficient dispute about the evidence as to require

submission to the jury, or whether the evidence favors one side so strongly that it is entitled to judgment as a matter of law. *Anderson*, 477 U.S. at 251–52.

## III.

The parties do not dispute that the Guaranty at issue complies with the terms of KRS § 371.065. Under this statute, a guaranty is valid as long as it complies with one of three stated conditions. One such condition is that the guaranty expressly refer to the instrument that it guarantees. *See* KRS § 371.065. In this case, Smith signed a Personal Guaranty that expressly stated that he would be personally liable for the full amount of Fortress' indebtedness in the event of its default under a note and loan agreement. [Record No. 16, Ex. F] When Callidus later extended additional financing under the Amended and Restated Loan Agreement, Smith signed a Re-Affirmation regarding his obligations under the original Guaranty and also agreed to extend his personal liability to the Fortress' indebtedness under the Amended Loan. [Record No. 16, Ex. G] As a result, the Guaranty is binding.

Next, there is no dispute that Fortress defaulted on its obligations. And it is clear that Smith has not paid the amount of indebtedness pursuant to his obligations under the Guaranty. Callidus argues that this constitutes a breach and that, pursuant to the terms of the Guaranty, the Court should grant summary judgment against Smith and impose liability for the full amount due under the Loan, along with all costs and attorneys' fees that Callidus incurred in attempting to collect the debt.

In its response, Smith argues that summary judgment is improper because: (1) his statutory right to notice of disposition of the collateral bars Callidus' recovery; (2) there are genuine issues of fact regarding the commercial reasonableness of Callidus' disposition of the collateral; and (3) there are genuine issues of material fact regarding Callidus' alleged

fraudulent inducement of the guaranty and the loan agreement. But for the reasons stated below, each of Smith's assertions is unavailing. Callidus is entitled to judgment as a matter of law.

### A.    Notice of Disposition of Collateral

Smith first argues that Callidus is barred from recovery because it did not provide Smith with notice of the sale of Callidus' collateral. Callidus, however, is not barred from recovery on these grounds because it did not dispose of the collateral at issue. As a result, it was not required to give Smith notice of the sale. Thus, the bar to recovery does not apply to Callidus and Smith cannot avoid his obligations under the Guaranty for this reason.

Under KRS § 355.9-611, "a secured party that disposes of collateral under KRS [§] 355.9-610 shall send to [any secondary obligor] a reasonable authenticated notification of disposition." K.R.S. § 355.9-611. If a secured creditor disposes of collateral and fails to provide the requisite notice, the creditor is estopped from collecting a deficiency judgment against the secondary obligor. *Holt v. Peoples Bank of Mount Washington*, 814 S.W.2d 568, 570-71 (Ky. 1991).

Smith argues that a secured creditor need not actually sell its collateral, or even have possession of its collateral prior to the sale, to be treated as disposing of its collateral and thereby barred from recovery under KRS § 355-9.611 and *Holt*. Instead, Smith asserts, when a debtor sells the secured creditor's collateral, the creditor is nonetheless deemed to have disposed of the collateral if the creditor had "the control or leverage to approve or disapprove the transaction, i.e., [if] the secured party's participation in the disposition is necessary for its effectuation." *Regions Bank v. Trailer Source*, No. M2008-01167-COA-R3-CV, 2010 WL 2074590, at *8 (Tenn. Ct. App. May 21, 2010).

Unlike the creditor in *Regions Bank,* Callidus was not in control of the disposition of the subject collateral. In *Regions Bank*, a senior and junior lienholder held a security interest in the same collateral. *Id*. When the debtor defaulted, the senior lienholder obtained possession of the certificates of title and had a third party sell the collateral and return the proceeds to the senior lienholder. *Id*. And when the junior lienholder sued the senior lienholder (alleging that the sale was commercially unreasonable), the court held that whether the senior lienholder "disposed of" the collateral depended on whether it had control over the sale. *Id*. at *9. Based on the facts presented, the court concluded that it exercised control. *Id*. Unlike Callidus, the creditor directed the third party to sell the collateral, and it immediately received the proceeds from the sale.

Here, Callidus was not required to give notice of Fortress' sale of collateral because Callidus did not have control over the collateral or dispose of it. Smith asserts that Callidus controlled the sale because it gave "its legally necessary consent to, and negotiate[ed] the terms of" the sale. [Record No. 21, p. 21] As an initial matter, consenting to a sale and negotiating its terms does not rise to the level of actively controlling the sale, and Smith fails to cite contrary authority. Nevertheless, even if consenting and negotiating were sufficient to establish control of the sale, it would not justify a finding of control in this case because Callidus did not have a meaningful opportunity to do either in the present case.

Callidus was legally prohibiting from selling or even accessing the collateral once Fortress filed for bankruptcy under Chapter 11. After the filing, Fortress operated as a debtor-in-possession and remained in possession of its assets—including the Callidus collateral at issue. [Record No. 21, Ex. 23] Moreover, Callidus was subject to the automatic stay imposed under 11 U.S.C. § 362. The stay prohibits creditors from taking legal action against the debtor

and its assets. Additionally, the assets at issue were subject to a specific order of the Bankruptcy Court, which remained in effect until the debtor sold the collateral. [*Id.*] Accordingly, Callidus could not legally access the collateral that Smith alleges it sold.

Contrary to Smith's argument, the record demonstrates that Fortress controlled the sale of the collateral. Callidus had little input, if any, regarding the sale. Fortress conducted the sale pursuant to 11 U.S.C. § 363, which allows a debtor to sell the collateral free and clear of encumbrances. Fortress moved the Bankruptcy Court to approve the sale of substantially all of its assets. Throughout the motion, Fortress uses language clearly indicating that it was the entity responsible for administering the sale. [Record No. 21, Ex. 24] Fortress states that it exercised its "business judgment" in evaluating the potential sale, and states that the court should permit Fortress to sell its assets because, "[w]here a debtor believes[,] in the exercise of its business judgment[,] that such a . . . sale . . . of its bankruptcy estate is in the best interests of the debtor and its estate, the debtor may enter into such a transaction . . . ." [*Id.* at ¶ 13] While the motion makes it clear that Fortress is conducting the sale, the only references to Callidus state that Fortress had "consulted" with Callidus and "believe[d]" that it had Callidus' support for the sale. [*Id.* at ¶¶ 2, 7]

The record also demonstrates that Callidus cannot be said to have consented to the sale. Under § 363, a court can only authorize a sale if one of a number of stated conditions is satisfied. One condition is that the creditor consent to the sale. Smith states that "the only condition Fortress made any attempt to show that it satisfied was . . . Callidus' consent." [Record No. 21, p. 22] The fact that Fortress *attempted* to show Callidus' consent does not mean that Callidus gave its consent. In fact, Callidus did not consent to the sale in any meaningful sense. Instead, Callidus objected to the sale. [Record No. 21, Ex. 25] In its

motion, Callidus states that it "objects to the Debtor's Sale Motion and Bidding Procedures . . . ." [*Id*. at ¶ 3]  Moreover, acknowledging § 363's requirements, Callidus states that Fortress "assumes (and is hoping) that Callidus will consent to the proposed sale, thereby satisfying Section 363(f)(2).  However, Callidus has no intention of consenting to a sale of any of its Collateral free and clear of its liens" unless the sale is "acceptable to it." [*Id*. at ¶ 13]  Callidus concludes the motion by stating that it "will not consent to [Fortress' proposed] sale of its Collateral . . . ." [*Id*. at ¶ 17]

The Bankruptcy Court ultimately approved the sale over Callidus' objections.  Further, the record indicates that Fortress controlled the sale and that Callidus fought the sale that Fortress ultimately made.  Fortress received three bids for its collateral, one of which was from Callidus.  [Record No. 21, Ex. 32]  Fortress rejected Callidus' bid and, instead, accepted a bid from a third party that offered $100 and agreed to assume Fortress' junior debt. [*Id*.]  Callidus objected to these terms and the record states that Callidus and the buyer "were unable to agree on terms that would result in a consensual sale," but Fortress ultimately accepted the bid despite "Callidus' refusal to approve" it.  [*Id*. at 5]  Presumably, this interaction is what Smith references when he asserts that Callidus "negotiate[ed]" the terms of the sale.  But contrary to demonstrating Callidus' control over the sale as required by the rule that Smith cites, this demonstrates Callidus' lack of control, since the sale was completed over its objections both before and during the sale.

Even assuming there are circumstances in which a secured creditor can be deemed to have disposed of its collateral when the debtor sells it, the above undisputed facts demonstrate that those circumstances are not present here.  While the Bankruptcy Court ultimately approved the sale and stated that Callidus is deemed to have consented to it for purposes of §

363, the record establishes that Callidus did not consent to the sale in any meaningful sense. It would be unfair to impose forfeiture on a party for failing to provide notice of a sale that it was legally prohibiting from conducting and had little to no ability to control while receiving little or no benefit. This is particularly true where, as here, the guarantor is so closely affiliated with the debtor that the protections of notice are unnecessary and requiring notice would be superfluous. Accordingly, the Court concludes that Callidus did not dispose of the subject collateral and was not required to give notice to Smith of the sale. Smith cannot hide behind this requirement to avoid his obligations under the Guaranty.

### B. Commercially Unreasonable Disposition of Security

Smith also argues that summary judgment is not appropriate because there is a genuine issue of material fact regarding whether Callidus behaved commercially unreasonably in its disposition of collateral. More specifically, he argues that if Callidus negligently caused the collateral to depreciate in value, its negligence will reduce the amount that Callidus may recover.

Contrary to Smith's argument, the statutory scheme and case law make it clear that a creditor's right to pursue and recover from a guarantor is independent from its security interest and, therefore, is unaffected by any security that the creditor may possess. As a result, even if a creditor behaves in a commercially unreasonably manner in disposing of collateral, such actions do not affect whether the creditor is entitled to a judgment for the amount of the debt. Instead, the creditor may pursue a judgment, and the debtor may initiate a subsequent proceeding against the creditor for any unreasonableness in the disposition. Accordingly, any claim that Smith may have based on disposition of the subject collateral is distinct from Callidus' right to collect the full amount from Smith. There is no genuine issue of material

fact preventing summary judgment regarding any alleged commercial unreasonableness in the disposition of the collateral.

Kentucky law provides multiple remedies for a secured party in the event of a debtor's default. First, "[a] secured party may reduce a judgment, foreclose, or otherwise enforce the claim . . . ." K.R.S. § 355.9-601(1)(a). Second, "[a] secured party in possession of collateral . . . has the rights and duties provided in § 9-207," which include the right to dispose of the collateral and hold the proceeds or apply the proceeds to the outstanding debt. K.R.S. § 355.9-601(2); K.R.S. § 355-9.207(3). Further, the statutory provision is clear that a creditor is not required to elect between these remedies. Instead, the remedies "are cumulative and may be exercised simultaneously." K.R.S. § 355.9-601(3). As a result, a secured party may bring a judicial action for the amount due under a loan and take possession of the collateral once the debtor has defaulted. As noted in the comment to the Uniform Commercial Code provision that mirrors the language of KRS § 355-9-601, the debtor will not be harmed by this simultaneous pursuit of remedies because "[t]he liability scheme of Subpart 2 affords redress to an aggrieved debtor or obligor." U.C.C. § 9-207, cmt. 5.

Although Kentucky courts have not addressed the issue, others have concluded that the provision allowing creditors to pursue simultaneous remedies means that creditors are not required to dispose of collateral before obtaining a judgment on the financing document at issue. These courts note that "[t]he UCC does not require [a creditor] to elect a remedy," and this allows creditors to pursue a judgment against the debtor and/or guarantor for the amount of the indebtedness while also taking possession of the collateral that secures their debt. *SFG Commercial Aircraft Leasing, Inc. v. N59CC, LLC*, no. 3:09-cv-101-PPS, 2010 SL 883764, at *3 (N.D. Ind. Mar. 8, 2010). Because a creditor is not required to elect one of these remedies

but is, instead, free to pursue both simultaneously, a creditor may "obtain a money judgment for the full amount due and then proceed to dispose of the collateral." *Id.* (citing *Banc of America Leasing & Capital, LLC v. Walker Aircraft, LLC*, No. 09-1277, 2009 WL 3283885 (D. Minn. Oct. 9, 2009) (finding that UCC § 9-601 "expressly permit[s] [the creditor] to obtain a money judgment for the full amount due on the loans even though [the creditor] is in possession of the collateral); *see also Center Capital Corp. v. JR Lear 60-099, LLC*, 674 F. Supp. 2d 569, 572 (D. Del. 2009) (stating that "a creditor need not liquidate its collateral before seeking judgment against a debtor").

Given that the UCC permits a creditor to pursue a judgment on a note while retaining possession of collateral, courts have concluded that any commercial unreasonableness relating to a creditor's disposition of collateral has no impact on its entitlement to a judgment for the amount of the indebtedness pursuant to the financing documents.[1]  For example, in *Okefenokee Aircraft, Inc. v. Primesouth Bank*, defendants who had defaulted on a note and guaranty argued that summary judgment was not appropriate because there was a genuine issue of material fact regarding whether the lender behaved in a commercially unreasonable manner in repossessing collateral and failing to dispose of it.  676 S.E.2d 394, 396 (Ga. Ct. App. 2009).  They argued that summary judgment should not be granted because the amount of their indebtedness could not be determined until the collateral had been disposed of.  *Id.*  Because the UCC allows a

---

[1] Debtors and guarantors have recourse if a creditor disposes of collateral in a commercially unreasonable manner.  However, the creditor remains entitled to a judgment for the full amount of the indebtedness.  As noted previously, this recourse must be pursued in a subsequent proceeding. *See SFG Commercial Aircraft Leasing, Inc. v. N59CC, LLC*, No. 3:09-cv-101-PPS, 2010 WL 883764 (N.D. Ind. Mar. 8, 2010) (acknowledging the remedies available for commercial reasonableness under the UCC, but stating that those issues could not be raised until a later proceeding); *VFS Financing, Inc. v. Shilo Management Corp.*, 372 P.3d 582 (Or. Ct. App. 2016) (same).

lender to simultaneously repossess collateral and pursue "a money judgment for the full amount of the outstanding debt," the court concluded that, regardless of any commercial unreasonableness in the lender's disposition of collateral, it remained entitled to a judgment in the full amount of the indebtedness. *Id*. at 397. In reaching this conclusion, the court stated:

> It is of course basic law that the purpose of collateral is to secure the creditor and increase his change of recovery in the case of default. The existence of a security interest in no way affects the existence of the debt. It merely provides the secured party with an immediate source of recovery in addition to the standard remedies of an unsecured creditor. The intent of the code was to broaden the options open to a creditor after default rather than to limit them under the old theory of election of remedies.

*Id*. (citation omitted). Thus, the court concluded that the Defendants could not avoid or reduce their liability based on an assertion of commercial unreasonableness in the disposition of collateral. *Id*.[2]

In addition to the statutory scheme that allows simultaneous pursuit of remedies, under Kentucky law, when a guaranty provides a creditor with an absolute right to payment, the creditor is entitled to the full amount of a judgment against the guarantor regardless of whether the creditor first disposes of the collateral or does so in a commercially reasonable manner. When a guaranty is "subject to no conditions and contains an absolute promise to pay the outstanding indebtedness guaranteed," the guaranty constitutes an absolute guaranty of payment. *Sunnyside Homes of Rockledge, Inc. v. Gordon*, No. 2004-CA-001719-MR, 2006

---

[2] There are similar cases, which arise out of similar facts and with similar arguments made by debtors and guarantors seeking to avoid liability, that echo the court's reasoning in *Okefenokee*: *Center Capital*, 674 F. Supp. 2d at 573 (concluding that the creditor was permitted to obtain a judgment before disposing of the collateral that it had repossessed, and rejecting the defendant's argument of commercial unreasonableness); *VFS Financing, Inc. v. Shilo Management Corp.*, 372 P.3d 582 (Or. Ct. App. 2016) (holding that any alleged commercial unreasonableness in the lender's possession and eventual disposition of collateral did not affect the creditor's right to pursue a judgment on the note and guaranty).

WL 572920, at *3 (Ky. Ct. App. Mar. 10, 2005) (citing *Liberty Nat'l Bank and Trust Co. v. Russ*, 668 S.W.2d 567 (Ky. Ct. App. 1984)). In short, when a guaranty is absolute, it "is immediately enforceable against the guarantor without first proceeding against the principal or exhausting the collateral." *Banterra Bank v. Hendrick*, No. 5:09-cv-00012-TBR, 2011 WL 832455, at *6 (W.D. Ky. Mar. 3, 2011).

And if the guaranty is absolute, the creditor is free to seek a judgment against the guarantor before disposing of its collateral. The guarantor cannot avoid summary judgment on the grounds of impaired collateral. In *Kane v. Citizens Fidelity Bank and Trust Co.*, 668 S.W.2d 564 (Ky. Ct. App. 1984), the lender pursued a judgment on a guaranty rather than first disposing of collateral. The defendants opposed summary judgment because the lender allegedly had dealt with the collateral in a commercially unreasonable manner, causing its value to depreciate. *Id*. at 565. The court noted that the defendants had signed an absolute guaranty, which provided that the lender was "not required . . . to enforce any security interest in any collateral . . . as a condition precedent to enforcing" the guaranty or the guarantor's liability. *Id*. It also noted that, where a guarantor has signed an absolute guaranty, it cannot rely on any security as it is "obliged to pay the debts of the defaulting principal whether those debts are secured by collateral or not." *Id*. at 565-66 (quoting *Union Planters National Bank of Memphis v. Markowitz*, 468 F. Supp. 529 (W.D. Tenn. 1979).

For the reasons outlined above, Callidus is entitled to pursue a judgment without first disposing of its collateral. And this means that it is entitled to a judgment on the Guaranty regardless of whether it has disposed of the collateral or has done so reasonably. The Guaranty provided that "the liability of each Guarantor under this Guaranty shall be direct and immediate and not contingent upon the pursuit of any remedies . . . against the security or liens available

-18-

to Holder for the payment of the Obligations . . . ."  [Record No. 1, Ex. A, ¶ 3]  This is an absolute guaranty of payment which entitles Callidus to seek a judgment for the indebtedness under the Notes and Loan Agreement without first attempting to dispose of the collateral.  For purposes of determining whether Callidus is entitled to summary judgment on its claim of Fortress' indebtedness that Smith guaranteed under the Guaranty, the issue of whether Callidus has dealt with its collateral in a commercially unreasonable manner is irrelevant.[3]

### C.    Fraudulent Inducement

Smith's finally argues that he was fraudulently induced to sign the Guaranty, Re-Affirmation of Credit Documents, and Loan Agreement.  In support, he cites the Term Sheet and a number of oral representations from Callidus in which Callidus allegedly made promises related to his personal guaranty that were not reflected in the parties' final agreement.  Smith contends that, as a result of these false representations, Callidus fraudulently induced his signature.  Kentucky law, however, is clear that a fraudulent inducement claim cannot be based on alleged promises that are directly contradicted by a term in a signed agreement between the parties.  Accordingly, this claim fails to create a genuine issue of material fact concerning whether Smith is liable under the Guaranty.

Under Kentucky law, a party claiming fraudulent inducement must prove: "a) a material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury."  *Bear, Inc. v. Smith*, 303 S.W.3d 137, 142 (Ky. Ct. App. 2010).  For reliance, the party "must prove that his reliance on the misrepresentation was reasonable, and in making this determination, the Court

_____

[3] While Smith might be able to pursue other remedies under Kentucky law, those remedies are not relevant to Callidus' motion.

should consider [the party's] knowledge and experience." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 428 F. Supp. 2d 675, 682 (E.D. Ky. 2006) (citing *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1447 (6th Cir. 1993); *Vest v. Goode*, 209 S.W.2d 833, 836 (Ky. Ct. App. 1948). In evaluating reasonableness, courts consider the sophistication of the parties as "Kentucky courts have rejected arguments that 'the legislature also intended to protect sophisticated businessmen and corporate executives from their own promises.'" *Alliant Tax Credit Fund 31-A, Ltd. v. Nicholasville Comm. Housing, LLC*, 663 F. Supp. 2d 575, 583 (E.D. Ky. 2009) (quoting *Intercargo Ins. Co. v. B.W. Farrell, Inc.*, 89 S.W.3d 422, 427 (Ky. Ct. App. 2002)).

Again, Kentucky law is clear that a party cannot reasonably rely on oral representations that are directly contradicted by the terms of the agreement. For example, in *Fifth Third Bank v. Waxman*, 726 F. Supp. 2d 742 (E.D. Ky. 2010), the defendants argued that they should not be held to their obligations under the guaranties because the lender fraudulently induced their signatures. Specifically, they alleged that the lender had repeatedly assured them that the guaranties would never be enforced, and that these assurances amounted to fraudulent inducement. *Id*. at 744. Notwithstanding this claim, the court noted that defendants cannot "base a fraud in the inducement claim on their reliance on oral representations contrary to the terms of written agreements or disclaimers that they have acknowledged in writing." *Id*. at 752 (citing *Rivermont Inn, Inc. v Bass Hotels Resorts, Inc.*, 113 S.W.3d 636, 640-41 (Ky. App. 2003). Because the Guaranty made it clear that the defendants would be obligated to pay the borrower's debt when it defaulted, the court concluded that they could not reasonably rely on any of the lender's alleged oral representations to the contrary. *Id*. Accordingly, the court held that the fraudulent inducement claim failed as a matter of law. *Id*.

Here, Smith's fraudulent inducement claim fails as a matter of law. He contends that he relied on Callidus' representations that his guaranty would be released upon the occurrence of certain conditions and that he would not have signed the guaranty and loan agreements absent those representations. However, any reliance on these representations was not reasonable. Therefore, they cannot be the basis for a fraudulent inducement claim under Kentucky law. The only provision in any of the final documents that Smith signed that mentions a release of his personal guaranty makes clear that Callidus in no way obligated itself to release it: "The personal guarant[y] granted by . . . Smith . . . may be released, at the discretion of the Lender, at such time as the Borrower provides evidence satisfactory to the Lender of its receipt of cash proceeds of an additional equity infusion in the amount of no less than $2 million." [Record No. 16, Ex. E, 19] This provision is contained in the final written loan agreement that Smith signed. It directly contradicts Callidus' alleged oral representations that it *would* release the personal guaranty. It is clear from this provision that Callidus could release the guaranty at its option, but did not bind itself to do so. Again, consistent with Kentucky law, Smith may not reasonably rely on these alleged oral representations that directly contradict the terms of the writing that he signed. He cannot claim that these representations fraudulently induced him to sign the agreements.

The conclusion that Smith's reliance was not reasonable is further confirmed by the fact that Smith is a sophisticated party and was directly involved in the negotiation of the provision at issue. Before signing the final agreement, Smith states that he contacted Callidus about releasing the personal guaranties and its counsel informed him that "she had been told by Callidus that the personal guaranties were to stay in." [Record No. 22, ¶ 62] Further, when Smith received the draft of the agreement that contained the discretionary release of the

personal guaranties, Fortress' counsel sent Callidus a redline of the Agreement, altering that provision to provide that the guaranties "shall be released" upon "evidence satisfactory to" Callidus that the condition had been satisfied. [*Id*. at ¶ 68] Callidus' counsel then revised the agreement, replacing the binding language with the original discretionary language; this revision remained in the final version of the loan agreement. [*Id*. at ¶ 69] Callidus made it clear to Smith that the personal guaranties were to remain in the parties' agreements and that they would not be released. Accordingly, a reasonable, sophisticated party could not have reasonably relied on oral assurances from a Callidus employee that were directly contradicted by Callidus' counsel and the final version of the parties' agreement, which Smith knowingly signed.

Finally, the release in the Term Sheet cannot be the basis for a fraudulent inducement claim because it was not reasonable for Smith to treat the Term Sheet as a binding agreement. As an initial matter, the document states that the "Term Sheet must be accepted by the Borrower by no later than . . . September 3rd, 2014 after which the offer will expire." [Record No. 21, Ex. 4, 4] Smith did not sign the document until September 4th in his capacity as president of Fortress and not until September 5th in his personal capacity as guarantor. [*Id*.] Therefore, even if the Term Sheet could be considered an offer, it had terminated before Smith signed it such that he could not have accepted it to create a binding agreement. *See Warren v. Cary-Glendon Coal Co.*, 230 S.W.2d 638, 640 (Ky. Ct. App. 1950) (stating the rule that an offer cannot be accepted after it has expired). Smith could not rely on its terms relating to the personal guaranty as binding on Callidus.

Moreover, the language of the Term Sheet and subsequent agreements establish that the Term Sheet was not intended to be the final agreement between the parties. It cannot be

binding on Callidus, particularly when its terms directly contradict those of the writing which was intended to be the parties' final agreement. *See Associated Warehousing, Inc. v. Banterra Corp.*, 491 Fed. Appx. 516, 519-20 (6th Cir. 2012) (concluding that a term sheet was not binding on the lender where it did not include all of the terms of the loan agreement or specify the amount of the loan). The Term Sheet is too uncertain for Smith to reasonably have treated it as a binding agreement. It does not provide the actual amount of the loan, but instead states that Callidus will be lending "up to" stated amounts. Given that this crucial term was stated in indefinite terms, it should have been clear to Smith that the document was not intended to be the parties' final agreement. Instead, the final agreement was to be memorialized later in more certain terms. Under these circumstances, reliance on it is not reasonable. Indeed, the parties did ultimately sign a final, binding loan agreement which unambiguously states that "THIS WRITTEN AGREEMENT AND THE LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES." [Record No. 16, Ex. E, 40]. Through this provision, the parties were clearly aware that the Term Sheet was not intended to be a final agreement and was not binding. It was not reasonable for Smith to rely on a provision from the Term Sheet that was directly contradicted by the final agreement that he later signed.

Likewise, it was not reasonable for Smith to rely on alleged oral representations inasmuch as these representations were not binding and were contradicted by the final agreement that Smith signed. It again bears noting that Smith was a sophisticated party who directly participated in the negotiation of the personal guaranty provision and was fully aware of its terms before signing the document. Accordingly, there is no genuine issue of material fact regarding whether his signature on the Guaranty and Loan Agreement were fraudulently induced, and he cannot avoid summary judgment on this basis.

**IV.**

For the foregoing reasons, Smith's arguments against being held to his obligations under the Guaranty are unpersuasive, and Callidus is entitled to enforce the Guaranty against Smith. Under the Guaranty, Callidus is entitled to recover $21,475,254.23, together with interest at a rate of 21% under the Loan Agreement. Smith has not disputed that the amount owed pursuant to the terms of the Guaranty. Accordingly, it is hereby

**ORDERED** as follows:

1.     Plaintiff Callidus Capital Corporation's Motion for Summary Judgment [Record No. 16] is **GRANTED**.

2.     A corresponding Judgment shall be entered this date.

This 7th day of September, 2016.



Signed By:

*Danny C. Reeves*

United States District Judge